# United States Court of Appeals for the Federal Circuit

---

**DANIEL HAGGART, KATHY HAGGART, FOR THEMSELVES AND AS REPRESENTATIVES OF A CLASS OF SIMILARLY SITUATED PERSONS,**
*Plaintiffs-Appellees*

**v.**

**GORDON ARTHUR WOODLEY, DENISE LYNN WOODLEY,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2014-5106

---

Appeal from the United States Court of Federal Claims in No. 1:09-cv-00103-CFL, Judge Charles F. Lettow.

---

Decided: January 8, 2016

---

CARTER GLASGOW PHILLIPS, Sidley Austin LLP, Washington, DC, argued for plaintiffs-appellees. Also represented by JACQUELINE G. COOPER; THOMAS SCOTT STEWART, ELIZABETH MCCULLEY, Stewart Wald & McCul-

ley, LLC, Kansas City, MO; STEVEN WALD, St. Louis, MO; J. ROBERT SEARS, Baker, Sterchi, Cowden & Rice, LLC, St. Louis, MO.

DAVID CHARLES FREDERICK, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, DC, argued for plaintiffs-appellants.

MARY GABRIELLE SPRAGUE, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by WILLIAM B. LAZARUS, SAM HIRSCH.

MARK F. HEARNE, II, Arent Fox, LLP, Clayton, MO, for amicus curiae National Association of Reversionary Property Owners. Also represented by LINDSAY S.C. BRINTON, MEGHAN SUE LARGENT, STEPHEN SHARP DAVIS.

_____

Before REYNA, WALLACH, and HUGHES, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellants Gordon and Denise Woodley ("Woodleys") challenge the decision of the United States Court of Federal Claims ("Claims Court") approving a settlement agreement in a class action takings suit and awarding attorney fees to class counsel under the common fund doctrine. The United States ("Government") confesses error for failing to support the Woodleys' claim before the Claims Court and, like the Woodleys, now asserts the Claims Court erred in approving the settlement agreement and awarding class counsel attorney fees under the common fund doctrine. For the reasons set forth below, we vacate and remand on both issues.

## BACKGROUND

### I.    Procedural History

This is an appeal by two members of a certified class in a class action suit, challenging the Claims Court's approval of a $110 million settlement agreement and its decision to award class counsel approximately $35 million in attorney fees. *See Haggart v. United States* (*Haggart IV*), 116 Fed. Cl. 131 (2014). In 2003, Burlington Northern Railroad sought to divest its interest in three segments of land in King County, Washington. The divestiture was accomplished pursuant to section 208 of the National Trails Systems Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act").[1] The Surface Transportation Board, a federal adjudicatory body with broad economic regulatory oversight of railroads, authorized King County to use the railroad corridor for a public trail. However, the authorization forestalled the reversion of the property to the fee title landowners of the segments of land, who had only granted easements to the railroads.

In February 2009, Daniel and Kathy Haggart filed a complaint alleging that they and other landowners held interests in the railroad corridor and the Trails Act effect-

---

[1]    "The Trails Act is designed to preserve railroad rights-of-way by converting them into recreational trails." *Bywaters v. United States*, 670 F.3d 1221, 1225 (Fed. Cir. 2012). "Actions by the [G]overnment pursuant to the Trails Act can result in takings liability where the railroad acquired an easement from the property owner, the railroad's use of the property ceased, and the [G]overnment's action under the Trails Act prevented reversion of the property to the original owner." *Id.* (first citing *Preseault v. United States*, 100 F.3d 1525, 1550–52 (Fed. Cir. 1996) (en banc); then citing *Caldwell v. United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004)).

ed an uncompensated taking, in violation of the Fifth Amendment's Takings Clause, when King County acquired an interest in the land.[2]  Before the class was certified, sixty-four class members signed contingent fee agreements with class counsel, providing for a thirty-five percent fee of the "common fund."[3]  The Haggarts sought to define the common fund to include land values, interest, and statutory fees under section 304(c) of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("URA").  *See* 42 U.S.C. § 4654(c).

In September 2009, the Claims Court certified the class as an opt-in class action in accordance with Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC").  *See Haggart v. United States* (*Haggart I*), 89 Fed. Cl. 523, 536 (2009).  On October 16, 2009, class counsel notified the Claims Court and the Government that attorney fees "will be the greater of (a) 35% of any recovery (45% if the case is appealed); or (b) its statutory attorney[] fees."  S.A. 239.[4]  Class counsel also provided a

---

[2]  The Supreme Court has held that the Fifth Amendment requires the Government to pay compensation under the Tucker Act, 28 U.S.C. § 1491(a) (1982), to landowners whose reversionary interests in property were forestalled by the Trails Act.  *See Preseault v. I.C.C.*, 494 U.S. 1, 12–13 (1990).

[3]  The Government presents a different figure (sixty-one members).  *See* Government Br. 41 n.26.  However, Exhibit A of the Haggarts' Fifth Amended Complaint lists sixty-eight class members who entered an appearance and signed the contingency fee agreement (*i.e.*, those members identified as "Engaged").  Government Suppl. App. ("S.A.") 280–93.

[4]  Class counsel issued a notice of proposed final settlement that ultimately sought thirty as opposed to thirty-five percent of the recovery.

copy of the contingency fee agreement to class members who did not sign the agreement. The Claims Court subsequently divided the class into six subclasses. *See Haggart v. United States* (*Haggart II*), 104 Fed. Cl. 484, 491 (2012). After discovery, the parties filed cross-motions for partial summary judgment relating to two subclasses (subclasses two and four). In December 2012, the Claims Court granted-in-part and denied-in-part the cross-motions. *See Haggart v. United States* (*Haggart III*), 108 Fed. Cl. 70, 75 (2012) (asserting that the United States was "liable to the [s]ubclass [t]wo plaintiffs and several categories of the [s]ubclass [f]our plaintiffs for the taking of their property by issuing the trail-use authorizations when the rail easements did not encompass that use"). Following this decision, the class was winnowed to 253 class members.

## II. Settlement Negotiations

After the Claims Court's decision in *Haggart III*, the parties commenced settlement negotiations for the 253 class members. Both parties retained appraisers to independently examine the properties and to determine their fair market value.[5] After two days of mediation, the parties reached a settlement agreement in the amount of $110,000,000 for the land of the 253 class members and

---

[5] Because of the large number and different types of individual properties, the appraiser for the class established twenty-two valuation groups based on the character and use of the properties. Each of the twenty-two representative parcels was individually appraised. The unappraised parcels were each allocated to one of the twenty-two representative parcels. As to these parcels, the appraisers extrapolated the square footage values from the representative parcels, and using these values and other variable inputs, estimated the fair market value of the property interest taken.

agreed that interest should be compounded at 4.2% from the date of the taking, totaling an additional $27,961,218.69 through May 31, 2014.[6] After a second mediation, the parties settled on a statutory attorney fees figure of $2,580,000, consisting of $1,920,000 in fees and $660,000 in costs. Class members received notice regarding the likely terms of the settlement in September 2013, and many consented to them at that time.

III.   The Claims Court's Approval of the Settlement Agreement and Award of Attorney Fees

On February 12, 2014, class counsel and the Government filed a joint motion for approval of the settlement agreement. The joint motion asserted that "the proposed settlement is fair, reasonable, and adequate with respect to the individual claims of each opt-in class member and as to the class as a whole." S.A. 375. A day later, class counsel moved for an additional award of attorney fees under the common-fund doctrine.

On February 25, 2014, the Claims Court preliminarily approved the proposed settlement agreement and also approved a notice to be sent to the 253 class members. On February 27, 2014, a slightly revised notice advising class members of the overall settlement terms, as well as the settlement terms for the claims of individual class members (the notice included an individual disclosure page, which provided the principal and interest for each landowner's property) and attorney fees, was sent to class members.[7]

---

[6]   Because "the judgment was not paid on May 31, 2014, and has not been paid to date, interest is now accruing at approximately $16,100 per day." Haggart Br. 7.

[7]   The notice read in part:

The Claims Court held a fairness hearing on March 28, 2014. Of the 253 class members, only three participated in the hearing.[8] The Woodleys expressed their dissatisfaction with their proposed award, the awarding of additional attorney fees as a percentage of the total recovery, and the lack of "access by class members to appraisal data." *Haggart IV*, 116 Fed. Cl. at 142. The Claims Court granted class counsel's motion for approval of the attorney fees and division of the common fund. However, the court rejected class counsel's request that the statutory fee under the URA should be included in the common fund for purposes of calculating the contingent fee.

The Woodleys appeal the settlement approval and award of attorney fees. The remaining members of the class (collectively, the "Haggarts"), oppose the Woodleys through their class counsel. Although it failed to take a formal position below, on appeal the Government takes the position that class counsel improperly refused to

---

Class [c]ounsel has proposed that the Court approve an award of attorney[] fees in the amount of [thirty percent] of the settlement sum of $139,881,218.69, which includes principal, interest, and the statutory attorney[] fees, but excludes the $660,000.00 that the United States agreed to pay to reimburse Plaintiffs for the costs and expenses incurred on their behalf by [c]lass [c]ounsel. The attorney[] fee award requested by [c]lass [c]ounsel amounts to $41,964,365.61.

S.A. 434.

[8] In addition to the Woodleys, Michael Young and Sue Long also objected to the proposed settlement agreement.

disclose information necessary to allow class members to assess the fairness and reasonableness of the proposed settlement. This court has jurisdiction under 28 U.S.C. § 1295(a)(3) (2012).

## DISCUSSION

Before we address the merits of the Woodleys' claim, we are presented with multiple threshold issues. First, the Haggarts contend the Government lacks standing and thus cannot challenge the approved settlement and award of attorney fees.[9] Second, the Haggarts argue that by failing to raise its arguments before the Claims Court, the Government's contentions before this court are barred by waiver and judicial estoppel. We address each of these threshold issues in turn.

I.    The Government Has Standing to Challenge the Claims Court's Award of Attorney Fees Under the Common Fund Doctrine

The Haggarts contend that the Government lacks standing to seek review of "any issues pertaining to [c]lass [c]ounsel's recovery of attorney[] fees" because it lacks "any cognizable interests at stake that could support this [c]ourt's jurisdiction to review those issues." Haggart Br. 14 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In support of this argument, the Haggarts cite to the Claims Court decision in *Geneva Rock Products, Inc. v. United States*, in which the court determined that because "no class member has objected to the [attorney]

---

[9]    All parties agree that this court's jurisdiction does not rest on the Government demonstrating standing because the Woodleys have standing to contest the settlement agreement and award of attorney fees under the common fund doctrine. Instead, the Haggarts contend that this court should not consider the arguments proffered by the Government because it lacks standing.

fee award and . . . neither the [G]overnment's liability nor its susceptibility to damages is in any way contingent on, or affected by, the amount of attorney[] fees awarded apart from the statutory fee," the Government cannot establish standing to challenge the contingent fee. 119 Fed. Cl. 581, 593 (2015) (citations omitted).

Unlike the class members in *Geneva Rock*, here the Woodleys have objected to the attorney fee award. Also, the line of cases relied on by the Claims Court distinguish between the losing party's ability to challenge attorney fees to be paid from a *common fund* as opposed to a *statutory fee. See Copeland v. Marshall*, 641 F.2d 880, 905 n.57 (D.C. Cir. 1980) ("[W]here the prevailing party's fees are paid by the loser pursuant to statute . . . the losing party . . . *retains an interest in contesting the size of the fee. This is not the case in 'common fund' fee litigation*." (emphasis added)).

The Government possesses an institutional interest in assuring that courts do not abrogate Congress's intent by impermissibly substituting the common fund doctrine in place of a fee-shifting statute like the URA when awarding attorney fees. *See Freeman v. Ryan*, 408 F.2d 1204, 1206 (D.C. Cir. 1986) ("Where litigation involving federal programs comes to involve questions of attorney[] fees[,] the cognizant federal official has an *interest in the fee award* as well as the merits of the litigation even though, or assuming, the fee does not decrease funds in the Treasury." (emphasis added)). Attorney fee awards are "one aspect of the interest of Government officials in the programs they administer, an interest that is not to be narrowly and technically confined so as to limit presentation to courts of issues they consider to have significance in terms of their overall responsibilities as public officials." *Id.* Although we recognize the Fifth Amendment's Takings Clause is not a program administered by the Government, when an inverse condemnation action under the Tucker Act alleging a Government taking results in

an award of compensation and a statute expressly mandates the Attorney General, in settling such actions, to "determine" and "allow" "such sum as will in the opinion of . . . the Attorney General reimburse [] plaintiff for . . . reasonable attorney . . . fees," 42 U.S.C. § 4654(c), the Government retains an interest in defending the Attorney General's determination that the URA fee constitutes the reasonable attorney fee. *See Allen v. United States*, 606 F.2d 432, 434 (4th Cir. 1979) ("[E]ven though fees [were] not assessed against the [Government][,] . . . the [G]overnment [retains] [an] interest in the propriety of fees which it is obliged to disburse.").

Because Congress intended the URA to assure that plaintiffs in inverse-condemnation actions obtain just compensation for their property taken by the Government by requiring that the Government pay plaintiffs' reasonable attorney fees, *see Florida Rock Industries v. United States*, 9 Cl. Ct. 285, 291 (1985) ("The Act thus entitles a plaintiff to be made whole for expenses incurred in achieving victory"), the Government has an interest "in seeing that [the attorney fees] it owes to litigants are disbursed properly." *Allen*, 606 F.2d at 434.

## II.     The Government's Arguments Are Not Barred by Waiver or Judicial Estoppel

### A.  Waiver

The Haggarts contend the Government should not be allowed to "disavow[] th[e] settlement [agreement] . . . , based upon concerns that it could have raised, but did not raise, with [the Claims] [C]ourt." Haggart Br. 15. The Haggarts assert that during the fairness hearing, "[t]he [Government] [] sat mute on the disclosure issue. Instead, it emphasized the 'arduous process' that produced the settlement and defended [the settlement agreement] as 'fair, reasonable[,] and adequate.'" *Id.* at 16. (brackets and citations omitted). As to the attorney fee award, they contend the Government "affirmatively disclaimed any

interest in the matter, both in response to [c]lass [c]ounsel's fee motion and at the fairness hearing." *Id*. Thus, "[b]ecause the [Government] failed to raise these issues below," the Haggarts contend we should find them waived. *Id*. at 17.

The Government acknowledges that it "did not take a position below on the adequacy of [c]lass [c]ounsel's disclosures or its motion for additional fees." Government Reply Br. 3. However, with respect to the settlement agreement, it claims that it "assumed that [c]lass [c]ounsel had fulfilled its obligation to provide the owners relevant information," until the fairness hearing when the Woodleys "provided additional information about their communications with [c]lass [c]ounsel." Government Br. 19. On the basis of this information, the Government contends it "determined that [c]lass [c]ounsel improperly refused to disclose information necessary to evaluate the methodology for valuing the compensation proposed to be paid to each class member." *Id*. Thus, the Government avers that its current position constitutes a confession of error "for failing to take a position in the [Claims Court] on the [Woodleys'] assertions of inadequate disclosure" and "for failing to oppose in the [Claims Court] [c]lass [c]ounsel's motion for additional attorney[] fees under the common-fund doctrine." Government Reply Br. 4–5.

We are not bound to accept the Government's confession nor does it relieve us of our obligation to examine independently the errors confessed. *See Young v. United States*, 315 U.S. 257, 258–59 (1942). Nevertheless, the Supreme Court has held that the Government's assertion that reversible error has been committed is "entitled to great weight," *id*. at 258, and that "candid reversal of its position is commendable," *Orloff v. Willoughby*, 345 U.S. 83, 87 (1953); *see also Ramos v. Dep't of Justice*, 552 F.3d 1356, 1358 (Fed. Cir. 2009) (accepting the Government's confession of error). Because the Government's "error [should] not [be] penalized by precluding [its] subsequent

assertion of the truth," we find that the Government should be allowed to put forth its arguments. *Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C. Cir. 1980).

## B. Judicial Estoppel

The facts of this case render the Haggarts' judicial estoppel arguments untenable.[10]  Judicial estoppel is an equitable doctrine, designed to "protect the integrity of the judicial process" by "preven[ting] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."). Although "[t]he circumstances under which judicial estoppel may appropriately be invoked are [] not reducible to any general formulation or principle," *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982), "main factors" which typically inform a court's decision in applying the doctrine include: "(1) a party's later position is 'clearly inconsistent' with its prior position, (2) the party successfully persuaded a court to accept its prior position, and (3) the party 'would derive an unfair advantage or impose an unfair

---

[10]    Although the Supreme Court has applied the equitable doctrine of judicial estoppel to bar state governments from asserting particular arguments, it has never expressly applied the doctrine to the federal government. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (holding that under the doctrine of judicial estoppel, "New Hampshire is equitably barred from asserting—contrary to its position in the 1970's litigation—that the inland Piscataqua River boundary runs along the Maine shore").

detriment on the opposing party if not estopped,'" *Organic Seed Growers & Trade Ass'n v. Monsanto Co.*, 718 F.3d 1359, 1358–59 (Fed. Cir. 2013) (quoting *New Hampshire*, 532 U.S. at 750–51).

Although the Haggarts contend "[a]ll of [the factors in *Monsanto*] are present" in this case, they nonetheless concede the Government "raised *no issues* about [the inadequate disclosures] in the joint motion seeking approval of the settlement or at the fairness hearing." Haggart Br. 18 (emphasis added); *see also id.* at 20 n.9 (characterizing the Government's conduct as "studied silence"). Similarly, with respect to the attorney fee award, the Haggarts again assert "the [Government] formally took *no position* on it [before] the [Claims Court]." *Id.* at 19 (emphasis added).

The Haggarts do not contend the arguments made by the Government before the Claims Court contradict those made before this court because there was *no* precise argument proffered by the Government either before the Claims Court or in the fairness hearing. The Government's only attempt to do so was with regard to its assertion that the settlement agreement was "fair, reasonable[,] and adequate." *Id.* at 16 (brackets omitted) (quoting S.A. 545–46). However, acquiescence that the settlement agreement in *total* was fair, reasonable, and adequate is not inconsistent with the Government's current assertion that class counsel failed to provide adequate disclosure of how the settlement agreement was *distributed* among every individual class member.[11] *See*

---

[11] "While the [Government] continues to believe that the total principal amount of $110 million is fair to the class as a whole, the approval of the settlement without requiring proper disclosure constituted an abuse of discretion and this case should be remanded to the [Claims

S.A. 545–46 (During the fairness hearing, the Government asserted it "had specific points about the different properties and the issues that [were] involved with them and we didn't discuss necessarily *every individual property*, but there were common factors among groups of property that we discussed." (emphasis added)). Here, the Government has not disavowed or proffered any conflicting assertions not raised before the Claims Court or in the fairness hearing. What is more, its acquiescence or failure to take a position on the attorney fees issue is not congruent to a disavowal of a previous position and, thus, cannot form the basis for judicial estoppel. *See United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[I]f the [G]overnment is to be judicially estopped, the estoppel must be limited to a *precise argument* presented by the [G]overnment and accepted by the [court]." (emphasis added)).

Because the Government has not presented arguments at variance with its earlier contention, none of the three factors articulated in *Monsanto* are present in the case before us. Therefore, the Government's arguments are not barred by judicial estoppel.

III.    Class Counsel Failed to Disclose How It Calculated the Individual Compensation Amounts

We review the Claims Court's "legal holdings de novo and examine[] [its] factual findings for clear error." *Banks v. United States*, 741 F.3d 1268, 1275 (Fed. Cir. 2014) (citing *Bell BCI Co. v. United States*, 570 F.3d 1337, 1340 (Fed. Cir. 2009)). As to the Claims Court's approval of a class action settlement agreement, we review its determination that the agreement was fair, reasonable, and adequate for abuse of discretion. *See In re Cendant*

---

Court] for proper disclosure to all class members." Government Br. 28.

*Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001); *see also In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 (7th Cir. 1979)

The Government contends "[c]lass [c]ounsel improperly refused to disclose information necessary to evaluate the methodology for valuing the compensation proposed to be paid to each class member, and this refusal deprived class members of the ability to evaluate the fairness and reasonableness of the proposed settlement." Government Br. 19. The Woodleys and the Government also contend class counsel failed to provide "the square-footage documentation, appraisals or spreadsheets." *Id.* at 20 (footnotes omitted). According to the Government, compensation amounts were allocated to individual class members "based on the square-footage documentation, the appraisals of the representative parcels, and the series of three spreadsheets that show how [c]lass [c]ounsel and its appraiser extrapolated [dollar/square-footage] values from the appraised parcels to the unappraised parcels." *Id.* The spreadsheets include: "(1) the original spreadsheet reflecting [c]lass [c]ounsel's initial demand, (2) the spreadsheet prepared after the first day of mediation on May 29, 2013, reflecting a reduced demand, and (3) the spreadsheet reflecting the $110 million settlement."[12] *Id.* at 19–20.

---

[12]   According to the Government:

The relevant factors addressed in these documents are: (1) the 'before' parcel [square-footage]; (2) the before parcel $/[square-footage]; (3) the estimated cost of removing ballast from the right-of-way (the 'excavation cost') . . . ; (4) the 'after" parcel [square-footage] (deducting the [square footage] in the right-of-way); (5) the after parcel

The Haggarts contend the Claims Court "determined that class members had sufficient information concerning their individual settlement amounts, including the appraisals." Haggart Br. 27. They argue the Government and the Woodleys "fail to cite any authority supporting their argument that [c]lass [c]ounsel had a duty separate and apart from [RCFC] Rule 23(e)(1)[13] to provide the

---

$/[square-footage] (which is often different from the before parcel $/[square-footage]); and (6) whether the deed is a '*Roeder*' deed. Based on these factors, the 'before' parcel's value is ([square-footage] × ($/[square-footage])) − (excavation cost). The 'after' parcel's value is [square-footage] × ($/[square-footage]). The compensation amount for each parcel is generally (before value − after value) × 80% (for parcels with '*Roeder*' deeds), although there are exceptions.

Government Br. 21 (footnote omitted).

The term "Roeder deed" was established in *The Roeder Co. v. Burlington Northern Inc.*, where the Supreme Court of Washington, sitting en banc, described it as "a deed [that] refers to the right of way as a boundary but also gives a metes and bounds description of the abutting property." 105 Wash. 2d 567, 577 (Wash. 1986) (en banc).

[13]    RCFC Rule 23(e)(1) states:

(e) Settlement, Voluntary Dismissal, or Compromise. The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise.

specific documents and information requested by individual class members regarding their individual settlement amounts." *Id.* at 29 (footnote added). Finally, the Haggarts contend class counsel "'explained the underlying methodology and data' . . . [which] was more than adequate to enable class members to decide whether to object to the settlement — and [the Woodleys] in fact *did* object and were give a lengthy opportunity to be heard at the fairness hearing." *Id.* at 30 (quoting *Haggart IV*, 116 Fed. Cl. at 142). The Haggarts concede that "the master damages calculation spreadsheet for all 253 parcels was not provided to the class members (*i.e.*, class members were not shown the individual settlement amounts of *other* class members)." Haggart Br. 34–35. However, the Haggarts assert that "[c]lass [c]ounsel *explained* the methodology for determining the individual settlement amounts" during meetings held with class members in October 2013. *Id.* at 35 (emphasis added).

The precise issue before us is whether the Claims Court abused its discretion by finding class counsel's act of *explaining*, as opposed to *physically providing* objecting class members with a copy of the final spreadsheet detailing the precise methodology used to calculate the allocation of their property values, satisfied the requirement that the settlement agreement be "fair, reasonable and adequate." RCFC 23(e)(2). The facts of this case support our finding that it did.

We recognize that notice need not "contain a formula for calculating individual awards" or provide a "complete source of information." *Petrovic v. Amoco Oil Co.*, 200

---

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

RCFC 23(e)(1).

F.3d 1140, 1153 (8th Cir. 1999) (quoting *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1176 (8th Cir. 1995)); *see also* William B. Rubenstein, *Newberg on Class Actions* § 8:17 (5th ed. 2015) ("Newberg") ("[N]otice need not be overly long and stuffed with every relevant bit of information, and parties are not always strictly bound to the language approved by the court." (footnotes omitted)).  However, because notices are often general and need not encompass all relevant details, it is crucial that class counsel allow class members to "easily acquire more detailed information" should they choose to do so.  *Petrovic*, 200 F.3d at 1153; s*ee also Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011) (approving settlement agreement because the notice provided "instructions for accessing a website established for the purpose of providing additional information regarding the proposed settlement"); Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1797.6 (3d ed. 2004) ("[C]ourts have approved notices that did not contain some of the precise details of the settlement, such as the distribution or allocation plan, or the amount of attorney fees to be taken out, as long as sufficient contact information is provided to allow the class members to obtain more detailed information about those matters." (footnotes omitted)); *Manual for Complex Litigation, Fourth*, § 21.312 (2004) ("*Manual*") (stating that notice should "prominently display the address and phone number of class counsel and how to make inquiries").

Despite the Haggarts' attempt to frame it as such, this case does not concern the notice provided by class counsel to class members outlining the details of the settlement agreement.  Rather, it is rooted in the Woodleys' request for *additional information* concerning the methodology class counsel employed in calculating the fair market value of unappraised properties.  Courts have rarely had an opportunity to assess counsel's provision of additional information concerning a settlement agree-

ment due to the proliferation of the use of easily-accessible mediums, such as the Internet, which permits class members to evaluate the agreement in greater detail. *See Newberg* § 8:17 at 283 ("[A]s the Internet develops, it is easy, and relatively costless, to provide class members free access to a set of documents in the lawsuit at settlement, not just to a synopsis describing the settlement. . . . Given the ease of making this material available to class members, courts may become increasing[ly] wary of settlements that fail to do so."); *see also In re Pet Food Prods. Liab. Litig.,* 629 F.3d 333, 339–40 (3d Cir. 2010) ("[A] settlement website [was] established, through which class members could obtain additional information and copies of settlement documents.")

The Claims Court may approve a settlement proposal "only after a hearing and on finding that it is 'fair, reasonable, and adequate.'" RCFC 23(e)(2). Although typically articulated in the context of challenges to formal court-approved notices of settlement under Rule 23(e)(1) of the Federal Rules of Civil Procedure ("FRCP"), the general principle that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (citations omitted), is equally applicable in the context of the provision of additional information, *see In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) (reversing approval of a class action settlement because class members were not provided "information reasonably necessary for them to make a decision whether to object to the settlement"). Although "[t]here are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements," *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005), class counsel, either by notice or the method by which additional information is provided, must provide

"all necessary information for any class member to become fully apprised and make *any relevant* decisions," *Katrina*, 628 F.3d at 198 (emphasis added) (internal quotation marks and citation omitted). Of course what constitutes "necessary information" depends on the particular circumstances of the proposed settlement. *See Wal-Mart Stores*, 396 F.3d at 114.

In this case, due to the large number of individual properties, class counsel and the class appraiser divided the properties into three distinct categories: (1) "unique" properties; (2) "representative" properties; and (3) "non-representative" properties. *See Haggart IV*, 116 Fed. Cl. at 136. Properties characterized as unique "did not share enough common valuation features with any other properties directly appraised," thus their fair market values were "directly determined by an appraisal for that specific property." *Id*. Similarly, with respect to representative properties, determination of the parcels' fair market value was also based on a direct appraisal of the property. The only parcels not individually appraised were non-representative parcels. In calculating the fair market values of non-representative parcels, the properties were divided into twenty-two groups and within each group, representative parcels were chosen to serve as proxies for the properties in the group based on a myriad of factors such as "common use, zoning, similar location, and other significant features with the other properties in the subgroup." J.A. 85.

Full disclosure of the precise methodology employed in arriving at the value of non-representative properties is especially important in this context because of the various inputs used in calculating the fair market value of unappraised properties and the significant discrepancy in the allocation of the final property values. *See* S.A. 403–17 (proposed compensation ranged from $444.45 to more than $2.4 million). Where inequities in treatment exist among class members, class counsel must provide mem-

bers with sufficient information justifying any disparate treatment. *See Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 n.1 (6th Cir. 2013) (reversing the district court's approval of proposed settlement agreement and stating that "[e]ven if they were not disproportionate, we would still hold the inequities in treatment here are unfair because the record contains no justification for these inequities").

Because the fair market values of non-representative parcels were extrapolated from one of twenty-two representative groups, determinations of the fair market values of non-representative properties must have been derived from some methodology, using the value of the representative property and some variable inputs (*i.e.*, square footage documentation of the unappraised property, the topography of the property, and the excavation cost). However, it is undisputed that class counsel did not provide the Woodleys, or any other class members, with information about the representative property from which their parcel was extrapolated or how any of the variable inputs were valued in calculating the fair market value of their individual properties. In response, the Haggarts assert that counsel "did not provide to class members the appraisals of the [twenty-two] representative parcels because [counsel] believed that they would have been of no assistance to the class members in evaluating their individual settlement amounts." Haggart Br. 33. Thus, class counsel never provided class members with information about the base value from which the fair market value of their unappraised parcels was derived. Because the fair market value of each non-representative parcel is derivative of one of the twenty-two representative properties, the value of the representative properties constitutes the starting point in determining the value of non-representative properties. Absent provision of this value, class members cannot assess whether the fair market

value of their property was fair, reasonable, and adequate. *See* RCFC 23(e)(2).

Class counsel also asserts that it provided "the portion of the spreadsheet concerning each class member's parcel." Haggart Br. 35. However, this information does not constitute "necessary information for any class member to become fully apprised and make any relevant decision[]." *See Katrina*, 628 F.3d at 198 (citation omitted). A relevant decision could not have been made by any class member whose property was not directly appraised. Mere examination of the spreadsheet detailing the fair market value of the property provides no guidance or insight in determining whether the property value is fair, reasonable, and adequate because necessary information such as the articulation of the variables and other inputs from which the fair market value was derived was not provided. *See Manual* § 21.312 (Class counsel must "explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set forth those variations.").

We recognize receipt of only three objections from a class of 253 members militates in favor of approval of the settlement agreement.[14] However, in this instance, because counsel withheld additional information critical

---

[14]    *See, e.g.*, *Wal-Mart Stores*, 396 F.3d at 118 (stating that "the absence of substantial opposition is indicative of class approval" when only eighteen of five-million class members objected); *see also Raulerson v. United States*, 108 Fed. Cl. 675, 678 (2013) ("The fact that only a small number of class members object to a proposed settlement strongly favors approval." (citation omitted)); *Manual* § 21.61 at 310 ("The lack of significant opposition may mean that the settlement meets the requirements of fairness, reasonableness, and adequacy.").

to any evaluation of the settlement agreement, such conduct renders the agreement unfair because the Woodleys and all other class members were unable to verify whether their individual settlement awards were "fair, reasonable, and adequate." RCFC 23(e)(2). That objections are only by a minority of class members cannot ratify the deprivation of readily available information and does not negate the earnest efforts of class members, however few, from seeking fair compensation. *See Eubank v. Pella Corp.*, 753 F.3d 718, 721 (7th Cir. 2014) (noting "the importance . . . of objectors . . . and of intense judicial scrutiny of proposed class action settlements"); *see also Manual* § 21.61 (stating that the lack of significant opposition to a settlement agreement "might signify no more than inertia by class members").

With respect to the Haggarts' contention that class counsel "explained the methodology for determining the individual settlement amounts," Haggart Br. 35, apart from documents provided in the notice to the class, class counsel did not provide any additional documents such as the spreadsheets detailing the precise methodology used to calculate the fair market value of the properties that would have placed the Woodleys and other class members in a position to determine for themselves whether the allocation of the settlement agreement was fair, reasonable, and adequate, *see* S.A. 548 (Mrs. Woodley asserting during the fairness hearing that "[w]e would just like to see [the appraisal documentation] . . . . The appraisal starting point, the spreadsheets, the calculations. We've never seen them. [Class counsel] talked about it, briefly, but we've never seen it."); *see also Manual* § 21.312 (Asserting that class counsel must "provide information that will *enable class members* to calculate or at least estimate their individual recoveries." (emphasis added)).

Mere provision of the final values of the unappraised properties, without more, cannot render the settlement agreement "fair, reasonable, and adequate." RCFC

23(e)(2).  Moreover, under the Washington Rules of Professional Conduct ("RPC"), class counsel owes a fiduciary duty to his clients to furnish such information.  *See* Washington RPC 1.4(a)(4) ("A lawyer shall: promptly comply with reasonable requests for information.").  We see no reason why under these facts class counsel can or should deny his clients access to the physical copy of information which they are entitled to receive.  Otherwise, effective representation of the class members' interests cannot occur.  *See Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) (stating that to achieve "effective representation of the class's interests," the provision of adequate information includes allowing "access to materials produced in discovery" (citations omitted)).

The Claims Court erred in approving a settlement agreement where class counsel withheld critical information not provided in the mailed notice to class members, but which had been produced and was readily available.  Thus, the court abused its discretion by failing to consider the accessibility or availability of information necessary for the Woodleys and other class members to make an informed decision about the settlement agreement.  *See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 132 (2d Cir. 2014) (in a class action suit, a court abuses or exceeds the discretion accorded to it when "its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions" (internal quotation marks and citation omitted)); *see also Eastway Constr. Corp. v. City of N.Y.*, 821 F.2d 121, 123 (2d Cir. 1987) ("All discretion is to be exercised within reasonable limits.  The concept of discretion implies that a decision is lawful at any point within the outer limits of the range of choices appropriate to the issue at hand; at the same time, a decision outside those limits exceeds or, as it is infelici-

tously said, 'abuses' allowable discretion." (citations omitted)).

## IV.    The Common Fund Doctrine

We now turn to the Claims Court's award of attorney fees under the common fund doctrine.[15]   The common fund doctrine is rooted in the traditional practice of courts of equity and derives from the equitable power of the courts under the doctrines of *quantum meruit*, *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 128 (1885), and unjust enrichment, *Trustees v. Greenough*, 105 U.S. 527, 532 (1881).   Under the common fund doctrine, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to [] reasonable attorney[] fees from the fund as a whole."   *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted).

Our analysis requires three steps.   First, we address whether the circumstances of this case creates a common fund.   We then address whether the common fund doctrine is applicable under RCFC 23 class actions.   Finally, we determine whether an attorney may recover attorney fees under the common fund doctrine in lieu of reasonable attorney fees provided by the URA.   We take each of these issues in turn.

## A.  A Common Fund Exists

The Woodleys and the Government assert that, contrary to the Claims Court's determination, "[t]here is no common fund."   Woodley Br. 12.   Specifically, the Gov-

---

[15]    The doctrine presents one variant to the American Rule of attorney fees reaffirmed by the Supreme Court in *Alyeska Pipeline Service Company v. Wilderness Society*, under which all parties are to bear their own costs in litigation.   421 U.S. 240, 275 (1975).

ernment argues that "[t]he bundling of individual pay-
ments so [c]lass [c]ounsel can conveniently collect fees
cannot transform separate payments into a 'common fund'
entitling [c]lass [c]ounsel to common-fund fees." Govern-
ment Br. 38.

In response, the Haggarts argue that the Woodleys
and the Government's contention that the Claims Court's
"award was merely a 'bundling' of individual claims is []
puzzling" because "[a]ll class actions, and hence all class
action settlements, are necessarily a bundling of individ-
ual claims." Haggart Br. 41.

The issue here is whether the circumstances of this
case create a common fund. Although often collapsed by
courts into a single analysis, as we explain in greater
detail below, the question of whether a common fund has
been created is distinct from whether the doctrine may be
applied to allow class counsel or the prevailing litigant to
recover attorney fees. *See Brytus v. Spang & Co.*, 203
F.3d 238, 243 (3d Cir. 2000) ("[T]he fact that a common
fund has been created does not mean that the common
fund doctrine must be applied in awarding attorney's
fees."). Recovery of attorney fees under a common fund is
based on the existence of some inequity borne by counsel
or the successful litigant. *See id.* at 246. Conversely,
whether a common fund exists concerns whether the $110
million settlement agreement to be distributed to class
members may be so characterized. *See Knight v. United
States*, 982 F.2d 1573, 1582 (Fed. Cir. 1993).

Although the historical origins of the common fund
doctrine suggests it was primarily applied to decisions
involving express trusts in which there was a clearly
defined trust fund, *see Greenough*, 105 U.S. at 527; *Pettus*,
113 U.S. at 127, it has also been applied where the crea-
tion of the fund is prospective and has yet to be made
formally available to individuals who are similarly situat-
ed, *see Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 167

(1939).[16] The Supreme Court spoke more precisely on this issue in *Boeing*, where it determined that "[t]he criteria [for application of the common fund doctrine] are satisfied when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." 444 U.S. at 479. Here, the lump-sum amount is the $110 million to be paid by the Government and each landowner's individual ascertainable claim is the fair market value of his property. *Id.*

The Woodleys and the Government argue that because the individual appraisal values must first be determined, then summed before arriving at the $110 million settlement, this is substantively distinct from first determining the aggregate amount of the fund, then from this total, apportioning individual claims. However, predicating the creation of a common fund on the order in which the settlement agreement was calculated would yield an untenable distinction not contemplated by any prevailing Supreme Court precedent. The determination of a total settlement agreement is always derived from the aggregation of some underlying individual claim. Moreover, limiting the common fund doctrine to exclude the discrete bundling of individual awards would unduly narrow the application of the doctrine, which is expressly designed to give courts the power to equitably spread costs. *See Sprague*, 307 U.S. at 167.

Our decision finds support from the Ninth Circuit, which has allowed the creation of putative or hypothetical funds by aggregating the amount a defendant would pay in damages to members of the class under the settlement

---

[16]    In *Sprague*, the creation of the fund was not based on a common pool of money in which each claimant is entitled, but instead distributed across fourteen *individual* trusts. 307 U.S. at 166.

agreement. *See Staton v. Boeing Co.*, 327 F.3d 938, 972 (9th Cir. 2003); *see also id.* at 971 n.21 ("The description of the total amount of the [common] fund need not take any particular form and could result from adding up separately-enumerated amounts in the agreement."). Thus, we hold the circumstances in this case create a common fund.

### B. The Common Fund Doctrine is Applicable to RCFC 23 Class Actions

Because we find a common fund exists, we turn to the applicability of the common fund doctrine to RCFC 23 class actions. That is a question of law subject to de novo review. *See Capital Bancshares Inc. v. Fed. Deposit Ins. Corp.*, 957 F.2d 203, 209 (5th Cir. 1992).

The Government argues that even if we were to find that the "settlement created a 'common fund,' the common-fund doctrine still does not apply because there are *no non-clients* who benefit from class counsels' efforts in [RCFC 23] class-actions."[17] Government Br. 38 (emphasis added).

In response, the Haggarts argue the circumstances of this case render the application of the common fund doctrine apposite. Specifically, the Haggarts assert that "[c]lass [c]ounsel obtained a sizeable recovery that benefits all of the class members, and equity demands that all class members contribute to [class] [c]ounsel's compensation." Haggart Br. 39. The Haggarts also argue that

---

[17] RCFC 23 requires potential class members to opt-in to the class, whereas FRCP 23(b)(3) class actions are opt-out class actions. *See Newberg* § 9:48, at 551–53 ("The default rule in class actions is that a class member is included in the class unless she excludes herself; a court cannot, therefore adopt the reverse rule—that only class members who include themselves are part of the class.").

"RCFC 23 does not require opt-in class members to share the litigation expenses" and "[c]lass [c]ounsel d[id] not have a fee agreement with all of the class members (although all class members were made aware of the agreement) and all stand to recover substantial sums from the United States." *Id.* at 42.

The Government's contention that, because RCFC 23 requires potential class members to opt-in to the class, there can be "no non-clients who benefit from class counsels' efforts," Government Br. 38, presents a distinction without a difference. Here, class counsel initially had a thirty-five percent contingency fee agreement with some class members before the class was certified. *Haggart IV*, 116 Fed. Cl. at 137–38. However, upon certification of the class, "although all class members were made aware of the agreement," class counsel did "not have a fee agreement with *all* of the class members." Haggart Br. 42 (emphasis added). Thus, the fact that these members opted-in and were therefore "parties" to the litigation is irrelevant. Rather, in considering the application of the common fund doctrine, the relevant question is whether an inequity exists. *See Boeing Co.*, 444 U.S. at 478. Of the 253 class members entitled to compensation, we count only sixty-eight members as signing the contingency-fee agreement. Although 253 individuals opted-in to the class, it is clear that 185 (approximately 73%) of those members are not differently situated from absentees in a FRCP 23(b)(3) class action because they were not contractually obligated to contribute to the payment of attorney[] fees incurred on their behalves. Thus, contrary to the Government's assertion, what matters is not whether "counsel in RCFC 23 class actions *can* enter into agreements with each member at the opt-in stage," but whether he actually *did*. Government Br. 40 (emphases added).

Here, because 185 class members did not sign the contingency fee agreement, they were not contractually obligated to contribute to the costs of the litigation. Thus,

before considering how the URA impacts the application of the common fund doctrine, at this point in our discussion, it is clear that some inequity exists, at least with respect to sixty-eight members of the class. Ascribing significance to the fact that the remaining 185 members "opted-in" and were therefore parties to the litigation elevates form over substance. *See Sprague*, 307 U.S. at 167 ("[T]he formalities of the litigation . . . hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation.").

## C. Recovery of Attorney Fees Under the Common Fund Doctrine Is Preempted by the URA

We turn to whether the presence of the URA resolves the inequity. That is, we consider whether class counsel can recover attorney fees under the common fund doctrine in lieu of the URA, which provides class counsel with reasonable attorney fees. We review the determination of reasonable attorney fees for abuse of discretion. *See Bywaters*, 670 F.3d at 1228; *Hall v. Sec'y of Health & Human Servs.*, 640 F.3d 1351, 1356 (Fed. Cir. 2011). However, errors of law in the award of attorney fees are corrected without deference. *See Bywaters*, 670 F.3d at 1228–34; *Brytus*, 203 F.3d at 244.

Congress has determined that in certain cases the prevailing parties may recover their attorney fees from the opposing side. *See* 42 U.S.C. § 4654(c).[18] Statutes

---

[18]  Section 4654(c) of Title 42 of the United States Code provides in its entirety:

> The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding,

that provide for such fees are termed "fee-shifting" statutes. Unlike the common fund doctrine, fee-shifting statutes require the losing party to bear the burden of the attorney fees. Under a fee-shifting statute, the court calculates awards for attorney fees using the "lodestar method" which is "the product of reasonable hours times a reasonable rate." *City of Burlington v. Dague*, 505 U.S. 557, 559–60 (1992) (quoting *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986)).

In common fund cases, district courts have applied the lodestar method to determine the amount of attorney fees. *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994). However, unlike statutory fee-shifting cases, in common fund cases, courts have applied a risk multiplier when using the lodestar approach.[19] *Id.* Alternatively, as in this case, courts may determine the amount of attorney fees to be awarded from

---

> shall determine and award or allow to such plaintiff, as a party of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

42 U.S.C. § 4654(c).

[19] "A 'multiplier' is a number, such as 1.5 or 2, by which the base lodestar figure is multiplied to increase (or decrease) the award of attorney[] fees on the basis of factors such as the risk of prevailing on the merits of the case and the length of the proceedings." *See Staton*, 327 F.3d at 968. *But see Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546 (2010) (asserting that "there is a strong presumption that the lodestar is sufficient").

the fund by employing a percentage method. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class."); *see also Applegate v. United States*, 52 Fed. Cl. 751, 760 (2002) ("[C]ourts readily calculate fees [] as a percentage of the fund.").

The URA is a fee-shifting statute and provides for the award of "reasonable" attorney fees in two distinct circumstances. First, attorney fees may be awarded where the Government begins a condemnation proceeding resulting in either a final judgment that the Government may not acquire the property by condemnation or abandonment of the proceeding by the Government. *See* 42 U.S.C. § 4654(a)(1)–(2); *see also Bywaters*, 670 F.3d at 1227. Second, attorney fees may also be granted where, as in the case before us, a landowner brings an inverse condemnation action under the Tucker Act or the Little Tucker Act alleging a Government taking under the Fifth Amendment and that action results in an award of compensation for the taking. *See id.*; 42 U.S.C. § 4654(c).

The Government argues that "applying [a common fund] to a judgment specifying a sum certain for every party/client when the attorney will receive a reasonable statutory fee [under the URA] stretches the doctrine beyond all recognition." Government Br. 32. According to the Government, because "[f]ederal fee-shifting statutes, including the URA, . . . provide for defendants to pay 'reasonable' fees[,] [a]n additional fee is by definition unreasonable when a reasonable statutory fee has already been awarded." *Id.* at 41. Accordingly, the Government contends "[t]here is no basis in equity for awarding common-fund fees as well as the URA fees." *Id.*

The Haggarts assert the Supreme Court's decision in *Venegas v. Mitchell* is controlling because it "did not preclude recovery of additional attorney[] fees under a

contingency fee contract." Haggart Br. 44 (citing 495 U.S. 82, 90 (1990)). According to the Haggarts, "[t]he teaching of *Venegas* is that fee-shifting statutes do not regulate what clients pay their lawyers, and do not cap or limit the amount of fees that lawyers can collect." *Id.* at 45. Thus, the Haggarts contend "the URA does not address or regulate what plaintiffs are to pay [c]lass [c]ounsel, and does not impose any constraint on the [Claims Court's] inherent equitable authority to award common-fund fees." *Id.* at 45–46.

The Claims Court defined the common fund to include the principal amount and interest. *Haggart IV*, 116 Fed. Cl. at 144. However, it rejected the Haggarts' contention that the statutory attorney fees of $1,920,000, calculated using the lodestar method, must be included as part of the common fund. *Id.* ("[H]ere the contingent fee percentage should be applied to the principal and interest, not also to the amount of statutory fees."). The court found "that the common fund consists of $137,961,218.69 ($110,000,000 in principal [plus] $27,961,218.69 in interest)." *Id.* at 148.

As to whether class counsel's request for thirty percent of the common fund was reasonable, the Claims Court looked to factors it has previously applied in determining the percentage of recovery. *Id.* at 145. The court ultimately used a scaled methodology and, from the $110 million the Government agreed to pay, "award[ed] class counsel 30% of the first $50 million, 25% of the next $50 million, and 20% of all monies over $100 million." *Id.* at 148. Thus, the court awarded class counsel fees totaling $35,092,243.74. *Id.* Finally, because class counsel retained the agreed statutory fee, the court awarded class members "a dollar-for-dollar credit for the statutory fee paid by the [G]overnment in the amount of $1,920,000, [thus] reducing the amount of the attorney[] fees to paid

out of the common fund to $33,172,243.74.[20]  *Id.* (footnote omitted).

The fact that a common fund has been created is not sufficient to establish a finding that the common fund doctrine must be applied when awarding attorney fees, an assertion implicit in the Haggarts' argument. *See Brytus*, 203 F.3d at 243. Rather, recovery under the common fund doctrine derives from the equitable power of courts to create the obligation for attorney fees against benefits received as a result of the advocacy of another. *Knight*, 982 F.2d at 1580. Thus, recovery requires the existence of an *inequitable outcome*, which in turn requires redressability.

We begin our analysis by noting that, contrary to the Haggarts' contention and the Claims Court's determination, *Venegas* does not govern the case before us. *See Haggart IV*, 116 Fed. Cl. at 148 n.18 (stating that "to disallow a contingent fee in this case would be contrary to [*Venegas*]"). In *Venegas*, the Supreme Court held a statute authorizing payment of reasonable attorney fees to prevailing civil rights plaintiffs does not invalidate contingent fee contracts that would require a prevailing plaintiff to pay his attorney more than the statutory award against the defendant. 495 U.S. at 90 (stating that 42 U.S.C. § 1988 "does not interfere with the enforceability of a contingent-fee contract"). Unlike the common fund doctrine, which is imposed absent the express agreement of class members as a matter of equity, contingent fee awards are a matter of individual contract. Thus, although the Court's holding in *Venegas* may be applicable to class members who signed the contingent fee agreement, we see no reason to extend it to the majority

---

[20]  This amount represents approximately 24% of the common fund.

of class members, including the Woodleys, who did not sign the agreement.

The URA expressly allows landowners to retain the full compensation of the value of their property by mandating the Government to assume the litigation expenses of counsel in bringing forth the takings claim. *See* 42 U.S.C. §4654(c); (asserting that plaintiff shall be awarded "such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his . . . reasonable attorney . . . fees"); *see also URA Legislative History*, S.1, Senate Floor Remarks, Congressional Record, Senate, 115 Cong. Rec. 31533 (Oct. 27, 1969), Uniform Relocation Assistance and Land Acquisition Policies Act of 1969 ("Transactions must be carried out in a manner that will assure that the person whose property is taken is no worse off economically than before the property was taken."). Under the URA, it is the Government, as opposed to class counsel or another member of the plaintiff class, who bears the reasonable cost of the action; thus, the inequity that would otherwise result is expressly addressed by the statute. In the presence of the URA, we find *no inequity* to redress. The *sine qua non* of the common fund doctrine is that some inequity must exist. Without inequity, class counsel cannot attempt to augment reasonable attorney fees by substituting the application of the doctrine in place of the URA. Such an action not only undermines the purpose of the URA, *see Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 314 (1981) ("[W]hen Congress addresses a question previously governed by a decision rested on federal common law[,] the need for such an unusual exercise of lawmaking by federal courts disappears."), but also unjustly enriches class counsel at the expense of class members, a result diametric to the primary purpose of the common fund doctrine, *see Greenough*, 105 U.S. at 532; *see also Tex. v. Pankey*, 441 F.2d 236, 241 (10th Cir. 1971) (asserting that federal common law applies "[u]ntil the field has been made the

subject of comprehensive legislation or authorized administrative standards").

Our decision finds support in Supreme Court holdings concerning the intersection of law and equity. In *Petrella v. Metro-Goldwyn-Mayer, Inc.*, the Court found that the common law equitable doctrine of laches is inapplicable when Congress has, through statute, filled the void the common law doctrine was intended to address.[21] 134 S. Ct. 1962, 1973 (2014) ("Last, but hardly least, laches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation." (citation omitted)). According to the Supreme Court, because "[l]aches . . . originally served as a guide when no statute . . . controlled the claim; it can scarcely be described as a rule for intervening a statutory prescription." *Id.* at 1975. Similarly, the common fund is an equitable doctrine established for the primary purpose of addressing inequities resulting from the unjust enrichment of class members at the expense of the litigating party. With the enactment of the URA, which provides class counsel with reasonable fees as compensation for their efforts in bringing forth the litigation, Congress has spoken "directly to the question at issue." *Am. Elec. Power Co. v. Connecticut*, 131 S. Ct. 2527, 2537 (2011) (internal quotation marks, brackets, and citations omitted); *see id.* ("Legislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest congressional purpose' demanded for

---

[21] In *Petrella*, the Supreme Court rejected the application of laches to a statutorily defined limitations period, asserting that it has "never applied laches to bar in their entirety claims for discrete wrongs occurring within a federally prescribed limitations period." 134 S. Ct. 1962 at 1975.

preemption of state law." (bracket and citation omitted)); *see also Petrella*, 134 S. Ct. at 1977 (holding that applicable statutory language "leaves little place" for equitable principles to the contrary (citation omitted)).

Finally, the Haggarts point to the Ninth Circuit's decision in *Staton*, which held that statutory fee-shifting and the equitable common fund doctrine operate differently and should be treated separately as support for their contention that the common fund doctrine may be applied in the presence of a fee-shifting statute. *See Staton*, 327 F.3d at 967. *Staton* also held that "unless Congress has forbidden the application of the common fund doctrine in cases in which attorneys could potentially recover fees under the type of fee-shifting statute[][,] [] courts retain their equitable power to award common fund attorney[] fees." *Id.* at 968 (citing *Alyeska Pipeline*, 421 U.S. at 257–59). However, the Seventh Circuit in *Pierce v. Visteon Corp.*, limited the common fund doctrine to cases "outside the scope of a fee-shifting statute."[22] 791 F.3d 782, 787 (7th Cir. 2015); *see also id.* ("But this case was litigated under a fee-shifting statute, and we do not see a good reason why, in the absence of a contract, counsel should be entitled to money from the class on top of or in lieu of payment by the losing litigant.").

---

[22] In *Pierce*, terminated employees brought a putative class action suit against their previous employer, alleging that the employer failed to timely deliver notice of employees' opportunity to continue health insurance at their own expense under the Consolidated Omnibus Budget Reconciliation Act. 791 F.3d at 784. The court affirmed the district court's award of attorney fees under the Employee Retirement Income Security Act, 29 U.S.C. § 1132, a different fee-shifting statute than the one at issue in this case. *See id.*

We agree with the Seventh Circuit. The fact that Congress did not expressly abjure the common fund doctrine in enacting the URA is not dispositive. *See Petrella*, 134 S. Ct. at 1975 (asserting that equity "can scarcely be described as a rule for interpreting a statutory prescription"). What is more, we agree with the *Pierce* court's determination that permitting class counsel to recover in the presence of fee-shifting statutes similar to the URA contravenes the Supreme Court's decision in *Dague*. *See Pierce*, 791 F.3d at 787. In *Dague*, the Court held that, in calculating a reasonable fee under fee-shifting statutes like the URA, district courts should not include a multiplier that effectively compensates class counsel for risk of loss. *See* 505 U.S. at 562 ("We note at the outset that an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar."). However, similar to the contingent fee agreement addressed in *Dague*, allowing class counsel to recover under a common fund would operate in precisely the same manner because, like a contingent fee agreement, "[a] common-fund award . . . [effectively serves to] build[] in a multiplier in [] cases where counsel prevails." *Pierce*, 791 F.3d at 787.

We do not foreclose the application of the common fund doctrine in *all* instances in which a fee-shifting statute is present. Equity may sometimes deem it appropriate to give counsel a piece of either the final judgment or settlement agreement. *See id.* (positing that it may "sometimes [be] appropriate to give . . . [counsel] a slice of the class's recovery on top of a fee-shifting award"); *see also Brytus*, 203 F.3d at 247 ("This is not to say that the common fund doctrine may never be applied in a case for which there is a statutory fee provision . . . ."). At its heart, equity is about fairness. *See Petrella*, 134 S. Ct. at 1977 (asserting that equity may still intervene to address a party's conduct in certain circumstances).

In the present case, the URA provision was expressly enacted with the primary purpose of rendering property owners whole and fee recovery is governed by statute. The URA provides a reasonable fee and thus forecloses application of the common fund doctrine.

CONCLUSION

We reverse the Claims Court's approval of the settlement agreement and award of attorney fees under the common fund doctrine and remand for further consideration consistent with the foregoing. The Claims Court's decision is

**VACATED AND REMANDED**